KINETIC CONCEPTS, INC., KCI USA, Inc., and Medical Retro Design, Inc., Plaintiffs,

v.

HILLENBRAND INDUSTRIES, INC., Hill–Rom Company, Inc., and Hill–Rom, Inc., Defendants.

No. CIV.A.SA–95–CA–755FB.

United States District Court, W.D. Texas, San Antonio Division.

Jan. 2, 2003.

R. Laurence Macon, Akin, Gump, Strauss, Hauer & Feld, San Antonio, TX, Paul E. Slater, Mitchell H. Macknin, Gregg R. Hague, Greg Shinall, Sperling Slater & Spitz, Chicago, IL, for Kinetic Concepts, Medical Retro Design, Inc., plaintiffs.

Stephen P. Allison, Haynes & Boone, San Antonio, TX, Ricardo G. Cedillo, Davis, Cedillo & Mendoza, San Antonio, TX, Barry F. McNeil, Robin P. Hartmann, Sharon Nelson Freytag, Haynes and Boone, L.L.P., Dallas, TX, Richard Bruce Drubel, Jr., Boies Schiller, et al, Hanover, NH, Donald L. Flexner, Boies, Schiller & Flexner, Washington, DC, for Hillenbrand Industries, Inc., Hill–Rom Company, Inc., defendants.

## ORDER PUTTING THIS MATTER TO BED

BIERY, District Judge.

The case before the Court technically involves an antitrust controversy about hospital beds, the latest in a long running series of lawsuits among several related corporations.[1] In a larger sense, it is about two good up-by-the bootstrap families who have done much to improve healthcare, and who have been blessed with enormous wealth as a result of their innovations, but who have a propensity to sue each other if one perceives wrongdoing by the other. Of course, the one being sued thinks the other is filing frivolous claims.[2]

What were once the classical professions helping people with the physical, legal and spiritual challenges of life are now the medical and legal "industries," and institutions of the clergy threaten bankruptcy to protect silver chalices and earthly wealth from claimants and creditors.[3] While these changes have negative implications, positives exists as well, in this instance the technological creations plaintiffs and defendants have brought to the alleviation of patient suffering.

The cycles of health and disease and life and death have been extant on this small

---

**1.** See, e.g., Hill–Rom Co., Inc. v. Kinetic Concepts, Inc., 209 F.3d 1337 (Fed.Cir.2000); Kinetic Concepts, Inc. v. Support Sys. Int'l, Inc. & SSI Medical Servs., Inc., SA–91–CA–0927 (W.D.Tex.1994).

**2.** A Farmer came to a neighboring Lawyer, expressing great concern for an accident which he said had just happened. One of your Oxen, continued he, has been gored by an unlucky Bull of mine, and I should be glad to know how I am to make you reparation. Thou art a very honest fellow, replied the Lawyer, and wilt not think it unreasonable that I expect one of thy Oxen in return. It is no more than justice quoth the Farmer, to be sure; but what did I say?—I mistake—It is

your Bull that has killed one of my Oxen. Indeed says the Lawyer, that alters the case: I must inquire into the affair; and if—And If! said the Farmer—the business I find would have been concluded without an if, had you been as ready to do justice to others as to exact it from them.

NOAH WEBSTER, THE AMERICAN SPELLING BOOK 101–02 (Hartford, Hudson & Goodwin 1788)(italics emphasis in original; underline emphasis added).

**3.** Suzenne Goldenberg, Boston Archdiocese Threatens Bankruptcy, THE GUARDIAN, Dec. 3, 2002, available at http://www.guardian.co.uk/Print/0,3858,4559359,00.html.

planet since the Cambrian Era and beyond six hundred million years ago. The context of this case is the recent blink of the past seventy-five years of health care in the United States.

In a more simple time, the Leininger and Hillenbrand ancestors tilled the soil in Indiana. Dr. James Clarence Mudd of Springfield, Kentucky, assisted by his granddaughters opening farm gates, ministered to the sick and wounded.[4] Dr. Joaquin Gonzalez of San Antonio, Texas, made house calls to patients, using his wife's vintage handbag to carry tools of his profession until he could afford a proper physician's valise.[5] Exercising their medical arts, and often compensated with poultry and produce, the bedside manner was no doubt excellent but infant mortality was high, polio crippled, life spans were short and medical technology incipient. Some would say the good old days were not all that good.

In the mid to late twentieth century, an amendment to the social contract evolved resulting in the chickens and vegetables being replaced with pictures of George Washington and Abraham Lincoln sent by public and private third-party payors.[6] Physician incomes rose exponentially.[7] The infusion of capital enabled medical

science to augment medical art to delay death—even though nature still bats last.

The professional heirs of Drs. Mudd and Gonzalez are now often corporate employees caught between ancient Hippocratic devotion to patients and social policy questions of allocation of resources, and between historic vows of service when health care was the domain of religious and charitable institutions and modern business organizations seeking profit from human suffering and owing allegiance to stockholders, not patients. It might even be said that health care in America is the modern version of the Golden Rule: Those who have the gold rule.

The reasonable balance sought by people of goodwill to the challenge of fairly and efficiently sharing the blessings of better health and longevity for the most part must be struck in the market place and in the political laboratories of the elected legislative and executive branches of government. Before this part of the judicial branch, however, is now the latest chapter in this medical-legal dispute.

### Jury Verdict and the Proposed Resolution

Instead of anarchical violence, the parties came to court for the trial process of

---

**4.** *See generally Dr. J.C. Mudd Died Suddenly Saturday Night*, SPRINGFIELD KY. NEWS, Dec. 3, 1945.

**5.** *See generally The Medical News*, (Bexar County Med. Soc'y, San Antonio, TX), May 1978, at 7; Sept.1979, at 3.

**6.** *See* Jonathan B. Oberlander, *Managed Care and Medicare Reform*, 22 J. Health Pol., Pol'y & L. 595, 597 (1997)(although medical profession opposed Medicare, prepaid group plans and HMO coverage as introduced in the post World War II era, opinions seemed to change when monthly payments began being made). Court research can find no instances of U.S. physicians who do not take payments from insurance companies or government sources.

**7.** *Compare* physician incomes, which rose from an average of $13,432 in 1951, to $195,500 in 1995, *see* Phillip L. Burnstein & Jerry Cromwell, *Relative Incomes and Rates of Return for U.S. Physicians*, 4 J. HEALTH & ECON. 64, 65 (1985)(1951 through 1980); AMA CENTER FOR HEALTH POLICY RESEARCH, SOCIOECONOMIC CHARACTERISTICS OF MEDICAL PRACTICE 1988 (Martin L. Gonzalez & David W. Emmons eds., 1988)(1978 through 1987); AMA CENTER FOR HEALTH POLICY RESEARCH, SOCIOECONOMIC CHARACTERISTICS OF MEDICAL PRACTICE 1997 (Martin L. Gonzalez ed., 1997)(1985 through 1995), *with* the annual minimum wage, which rose from $1,500 to $8,500 during this same time period. *See* 29 U.S.C. § 206 (including Historical and Statutory Notes).

resolving their dispute. Extraordinarily able counsel and their staffs prepared and presented the facts and law.

After four weeks of trial, a jury of eight citizens, several of whom are employed by corporations even larger than those in this case, found unanimously in favor of plaintiffs on all issues submitted. The jury system worked, just as it has for hundreds of years, and just as Mr. Hamilton and his compatriots intended.[8]

The Court observes that counsel could have switched sides and it would of course not have changed the evidence or credibility of the personalities being evaluated by the jury. Nor would different lawyers have changed the jury's conclusion in its search for the Truth.

Nevertheless, the factual verdict is but another step along a very long road. Both sides face continuing legal expense and distraction from their business missions. Most importantly, neither party knows how this Court or the appellate courts will rule on legal issues and sufficiency of evidence questions if they risk going for the Whole Enchilada.[9]

### Conclusion

There is a concept in less materialistic Eastern religious thought that power and privilege and wealth corrupt the soul. The Western rural expression of that idea is "pigs get fat; hogs get slaughtered."

To none of the good people in this controversy do those aphorisms apply, as evidenced by the reasonable proposal, outlined in Appendix A, to compromise their differences and, hopefully, evolve beyond their litigious era. Should that metamorphosis not occur, the Court may invoke its inherent power to require these corporate and community leaders to kiss on the lips in front of the Alamo.

Accordingly, the proposed settlement is APPROVED by the Court, and IT IS HEREBY ORDERED that this case is DISMISSED. All motions pending are also DISMISSED AS MOOT.

PEACE.

### APPENDIX A

### PRESS RELEASE

### KINETIC CONCEPTS REACHES SETTLEMENT ON ANTI-TRUST AWARD

San Antonio, Texas, December 31, 2002—Kinetic Concepts, Inc. ("KCI") today announced that it has settled its antitrust lawsuit with Hillenbrand Industries, Inc. and Hill–Rom Company (together "Hillenbrand"). Under the settlement, Hillenbrand agreed to pay KCI up to $250 million. The parties released each other from all claims relating to the litigation. In connection with the settlement, the parties will ask the United States District Court for the Western District of Texas, San Antonio Division to dismiss the lawsuit with prejudice. Upon dismissal of the lawsuit by the court, Hillenbrand will pay KCI $175 million. Pursuant to the terms of the settlement agreement, Hillenbrand will pay to KCI an additional $75 million one year following the payment of the initial

---

8. The friends and adversaries of the plan of the convention, if they agree on nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists of this: the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

THE FEDERALIST No. 83, at 491, 499 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

9. A South Texas phrase for which the Court can find no citation, but assumes the reader will get the picture or ask a ʻSouth Texan for definition.

settlement amount, subject to certain conditions.

Kinetic Concepts, Inc. develops and markets innovative therapeutic healing systems that address skin breakdown, circulatory problems and pulmonary complications associated with patient immobility and chronic wounds. The Company's healing systems include specialty beds, mattress replacement systems, negative pressure wound therapy and related medical devices. Kinetic Concepts serves hospitals, long-term care facilities and patients in home care settings both in the U.S. and abroad.

## HILLENBRAND INDUSTRIES ANNOUNCES SETTLEMENT OF ANTITRUST LITIGATION

BATESVILLE, INDIANA, TUESDAY, DECEMBER, 31, 2002—Hillenbrand Industries Inc. (N.Y.SE:HB), a leader in the health care and funeral services industries, announced today the Company entered into a comprehensive settlement agreement relating to all pending antitrust litigation between the Company and its Hill-Rom business unit and Kinetic Concepts Inc. of San Antonio, Texas ("KCI") and one of its affiliates.

In connection with the settlement, the parties will ask the United States District Court for the Western District of Texas, San Antonio Division, to dismiss the lawsuit with prejudice. Upon dismissal of the lawsuit by the court, Hillenbrand Industries will pay KCI $175 million. Hillenbrand Industries will pay KCI an additional $75 million, without interest, one year after the initial payment, unless certain events have occurred such as a bankruptcy or change of control of KCI. Additionally, upon dismissal of the lawsuit the parties will release each other from all claims relating to the litigation and all pre-settlement claims relating to their respective businesses, as well as the future effects of certain pre-settlement matters. Neither party admitted any liability or fault in connection with the settlement.

A litigation charge has been taken and a litigation accrual established by Hillenbrand Industries in the fourth quarter of fiscal 2002 of $250 million, subject to an adjustment of the accrual if the second payment of $75 million is not made. Hillenbrand Industries intends to fund the initial settlement payment of $175 million from its cash on hand. After funding the initial payment, the Company will still have a significant cash balance, strong cash flows and $500 million in availability under its revolving credit facility to fund the execution of its strategic initiatives.

"Though we continue to strongly believe our actions have been both legal and ethical, it is in the best interests of our shareholders to put this matter behind us. We are confident we can create substantially more value for our shareholders through the successful execution of our strategy of profitable growth as opposed to tying up significant capital through protracted and expensive appeal of this litigation. With this matter firmly behind us, we are focused on building our business by investing in new product development and new business development in the healthcare market and ultimately achieving our long-term goals of 10% annual revenue and 15% annual earnings growth," said Frederick W. Rockwood, president and chief executive officer of Hillenbrand Industries.

On August 16, 1995, KCI and Medical Retro Design, Inc. (collectively, the "plaintiffs"), filed suit against Hillenbrand Industries, and its Hill-Rom subsidiary in the United States District Court for the Western District of Texas, San Antonio Division.

The plaintiffs alleged violation of various antitrust laws, including illegal bundling of products, predatory pricing, refusal to deal

and attempting to monopolize the hospital bed industry. They sought monetary damages totaling in excess of $350 million, trebling of any damages that may be allowed by the court, and injunctions to prevent further alleged unlawful activities. On September 27, 2002, the jury in this litigation matter awarded the plaintiffs $173.6 million in damages, subject to trebling, the addition of attorneys' fees and potential injunctive relief if the court upheld the jury award. Hillenbrand Industries initially announced its intention to appeal the verdict if it was upheld by the court, a process that could have taken as long as two years.

## About Hillenbrand Industries Inc.

Hillenbrand Industries, Inc., headquartered in Batesville, Indiana, is a publicly traded holding company for three major wholly owned businesses serving the health care and funeral services industries. All three subsidiaries have headquarters in Batesville, Indiana.

Hillenbrand Industries' Health Care Group consists of Hill–Rom Company, a recognized leader in the worldwide health care community providing sales, rentals, service and support for products including beds, therapy surfaces, stretchers, infant warmers, incubators, furniture, communication systems, surgical columns, medical gas management systems, modular headwalls and lighting systems.

The company's Funeral Services Group consists of two businesses: Batesville Casket Company, the leading manufacturer and supplier of burial caskets, cremation products and related services to licensed funeral homes; and Forethought Financial Services, the leading provider of insurance and trust-based financial products and services for pre-planning funeral services.

## Disclosure Regarding Forward–Looking Statement:

Certain statements in this press release contain forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, regarding the Company's future plans, objectives, beliefs, expectations, representations and projections. The Company has tried, wherever possible, to identify these forward-looking statements by using words such as "confidence," "ability," "generate," "superior," "value," "profitable," "growth," "improving," "lowering," "ensuring," and "excellence," but their absence does not mean that the statement is not forward-looking. Forward-looking statements include statements regarding: generating profitable revenue growth, improving asset utilization, lowering our cost structure, strategically managing assets and ensuring excellence in leadership talent. It is important to note that the Company's actual results could differ materially from those in any such forward-looking statements. They are not guarantees of future performance. Factors that could cause actual results to differ include but are not limited to: a downturn in the general business and economic conditions of the Company's customers, a decrease in death rates, whether the Company's new products are successful in the marketplace, a decline in customers' Medicare reimbursements could impact the Company's financial performance if those customers decreased capital spending, unsuccessful realignment and cost reduction activities previously announced, unanticipated legal matters or unfavorable legal results and compliance with certain regulations, certification requirements for new and existing products and unexpected negative performance of the Company's insurance investment portfolio. The Company assumes no obligation to update or revise any for-

ward-looking statements. Readers should also refer to the various disclosures made by the Company in the Company's periodic reports on Forms 10–K, 10–Q and 8–K filed with the Securities and Exchange Commission.